UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DAVID L. DRAKE, et al., )
)
      Plaintiffs, )
)
    v. )      Case No. 1:22-CV-21-ACL
)
OLD DOMINION FREIGHT LINE, )
INC., et al. )
)
      Defendants. )

## MEMORANDUM AND ORDER

This matter is before the Court on the Complaint of Plaintiffs David L. Drake and

Rebecca Ann Drake against Defendants Old Dominion Freight Line, Inc. ("Old Dominion") and

its employee Toreano Barnes, following an accident involving a semi-truck operated by Barnes.

(Doc. 1.)  Presently pending before the Court are three motions to exclude the testimony of

Defendants' experts filed by Plaintiffs (Docs. 60, 62, 64) and two motions to exclude the

testimony of Plaintiffs' experts filed by Defendants (Docs. 76, 78).  These motions are fully

briefed and ready for disposition.

### I.    Background

Plaintiffs filed this action based on diversity of citizenship under 28 U.S.C. § 1332(a)(1).

The Complaint alleges two counts arising from the accident between Plaintiff David Drake and

Defendant Barnes that occurred on May 4, 2017.  In Count I, David Drake asserts a negligence

claim against Defendants Old Dominion and Barnes.  In Count II, Plaintiff Rebecca A. Drake

alleges a loss of consortium claim against Defendants Old Dominion and Barnes.  Plaintiffs'

claims against Old Dominion are based on the doctrine of *respondeat superior.*  As relief,

Plaintiffs request compensatory damages and punitive damages for each claim, as well as post-

judgment interest, costs, and attorney's fees.

Plaintiffs allege that Barnes negligently operated his semi-truck by failing to keep a careful lookout, driving in a reckless manner without due care, failing to yield to oncoming traffic, failing to yield the right of way to Drake, colliding with Drake's vehicle, and failing to use appropriate evasive procedures to avoid the collision.  They contend that Defendants' actions and conduct as alleged were "willful and wanton in that Defendants showed an utter indifference to, or conscious disregard for, Plaintiff David L. Drake's safety and the safety of others…" (Doc. 1 at 4.)  Plaintiffs contend that Drake suffered a traumatic brain injury, among other injuries, as a result of the crash.

The Court has granted Defendants' Motion for Summary Judgment as to Plaintiffs' claims for punitive damages, but denied the Motion as to Plaintiffs' claims for negligence due to the presence of genuine factual disputes regarding liability.

Plaintiffs have filed motions to exclude the following experts under Federal Rule of Evidence 702:  Douglas P. Gibson, Ph.D.; Richard Turner, Ph.D.; and Seth  Tuwiner, M.D. Defendants have requested that the testimony of Plaintiffs' experts Linda Day and George Johnstone, Ph.D., be excluded.

## II.    Motions to Exclude Testimony

### A.  Legal Standard

Federal Rule of Evidence 702, amended following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and most recently in 2023, provides the standard for the admission of expert testimony:[1]

---

[1] Rule 702 was amended to directly state that the proponent of the expert testimony must establish these reliability requirements by a preponderance of the evidence, a principle already established in our case law.  *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Based on Rule 702, the Eighth Circuit gives a three-part test to determine the admissibility of expert testimony:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted).  "The proponent of the expert testimony bears the burden to prove its admissibility."

*Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1114 (8th Cir. 2007) (citing *Lauzon*, 270 F.3d at 686).  The rules for the admissibility of expert testimony favor admission over exclusion.

*Lauzon*, 270 F.3d at 686.

The Court in *Daubert* emphasized that the inquiry required by FRE 702 is intended to be flexible.  509 U.S. at 594.  Accordingly, the Eighth Circuit has held that expert testimony should be liberally admitted, with any doubts resolved in favor of admissibility.  *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).  Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the

---

Cir. 2006) ("[T]he proponent of the expert testimony must show by a preponderance of the evidence" that the expert's opinion is reliable.).

traditional and appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596.

### B. Plaintiffs' Motions

### 1. Dr. Gibson

Dr. Gibson performed a neuropsychological evaluation of Mr. Drake on September 29, 2023, in order to assess his "cognitive, emotional and behavioral functioning." (Doc. 60-4 at p. 1.0.)

### a. Qualifications

Plaintiffs first argue that Dr. Gibson—a board-certified health psychologist—lacks the qualifications necessary to offer a reliable neuropsychological opinion, as he is not a board-certified neuropsychologist. They further argue that Dr. Gibson's opinions about Drake's cognitive functions are inadmissible because the only tests performed by Dr. Gibson were validity tests which serve only to evaluate Drake's credibility as a witness.

Defendants respond that Dr. Gibson's education, training, experience, and credentials qualify him to provide expert opinion testimony in the field of neuropsychology under *Daubert*. They argue that Dr. Gibson's opinions evaluate Drake's condition and not his credibility as a witness and are therefore admissible.

"Rule 702 only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.' Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO General Ins. Co.,* 447 F.3d 1096, 1000 (8th Cir. 2006) (internal citations omitted) (holding that a neurologist, despite not being an orthopedist, was

4

qualified to testify as to the cause of the plaintiff's shoulder problems, which was "within his realm of expertise" as a neurologist and physician).

Here, Dr. Gibson obtained his undergraduate degree, Master of Science, and doctorate in psychology. (Doc. 72-1 at p. 1.) He completed post-doctoral education in clinical neuropsychology. *Id.* Dr. Gibson is board-certified by the American Board of Professional Psychology (ABPP) and is a member of the American Psychological Association (APA), including its divisions for Clinical Neuropsychology, Military Psychology, and Clinical Health Psychology. *Id.* From 2007 to 2016, Dr. Gibson performed neuropsychological evaluations of soldiers for the Virginia Army National Guard, serving as the Brigade Psychologist to the 116th Regiment Infantry Brigade Combat Team. *Id.* at 4. He served as a neuropsychologist for the United States Central Intelligence Agency (CIA) for eight years. *Id.* at 3. While employed with the CIA, Dr. Gibson was appointed to serve as one of the neuropsychologists co-developing the CIA's traumatic brain injury program. *Id.* He has performed neuropsychological assessments for more than twenty years. *Id.*

The Court finds that Dr. Gibson's extensive experience, training, and education qualify him to provide an expert opinion in the field of neuropsychology. Plaintiffs' criticism requiring his lack of board certification goes to the weight of this testimony, rather than its admissibility.

### b. Credibility Opinions

Plaintiffs next argue that Dr. Gibson's opinions are inadmissible because they amount to an inappropriate determination of Drake's credibility as a witness. Plaintiffs state that Dr. Gibson chose not to perform any substantive tests of Drake's functioning because Dr. Gibson concluded that all the validity tests indicated that Drake's testing was not valid. They contend

that Dr. Gibson's only affirmative opinion in this case is that Drake's behavior and results reflected malingering.

Defendants respond that Plaintiffs oversimplify and misstate Dr. Gibson's opinions. They contend that Dr. Gibson's opinions regarding his review of Drake's neuropsychological testing and his criticisms of Plaintiffs' expert Dr. Brick Johnstone are admissible and the proper subject of expert testimony.  Plaintiffs argue that Dr. Gibson's opinions regarding his examination of Drake do not amount to impermissible commentary on his credibility as a witness.

Dr. Gibson's report indicates that he reviewed Drake's medical records, employment records, education records, Plaintiffs' experts' evaluations and reports, the Drakes' deposition testimony and responses to interrogatories, and Social Security records, among other evidence. (Doc. 72-4 at p. 1-2.)  He performed a clinical interview of Mr. Drake and administered the following psychological testing: Green's Medical Symptom Validity Test (MSVT), Rey-15 Item Test with Recognition, Inventory of Problems-29 (IOP-29), Structured Inventory of Malingered Symptomatology (SIMS), and Test of Premorbid Functioning (TOPF).  *Id.* at 2-3.  Dr. Gibson listed several tests that he noted "could not be administered due to failed performance testing," as well as tests that were not administered due to Drake's "complaints of fatigue and inability to read."  *Id.* at 3.

Dr. Gibson's mental status examination of Drake revealed "no evidence of inappropriate affect at any point throughout the evaluation which lasted over 4 hours."  *Id.* at 6.  Dr. Gibson provided his behavioral observations, concluding that there was "no evidence of any cognitive dysfunction despite his extreme self-report of impairment."  *Id.* at 7.  Dr. Gibson administered the TOPF, a measure of premorbid functioning, on which Drake obtained a score of 75 (4th

percentile). *Id.* He stated that this score placed Drake within the "borderline range of mental functioning prior to the subject accident." *Id.* Dr. Gibson indicated that Drake's performance on cognitive testing could be expected to range anywhere from the "impaired" to the "low average" range with normal variability. *Id.*

Dr. Gibson next administered performance validity testing. On both the Green's Medical Symptom Validity Test and the Rey-15 Item Test with Recognition, Drake scored significantly below the cutoff, which represented "non-credible responding and likely feigning." *Id.* at 7-8. Symptom validity testing was also indicative of "feigning and possible malingering." *Id.* at 8-9. Dr. Gibson indicated that no DSM-5 diagnosis could be made due to Drake's "non-credible presentation along with failures on multiple performance and symptom validity testing," although Drake "most certainly does not meet the criteria for any neurocognitive diagnosis as his cognitive functioning is clearly intact despite his self-report of profound impairment." *Id.* at 10. He noted Drake had documented attention deficit/hyperactivity disorder and "issues with depression and anxiety" which predated the subject accident. *Id.* Dr. Gibson then summarized Drake's treatment history, including the evaluation and opinions of Plaintiffs' expert Dr. Johnstone. *Id.* at 12-14.

Dr. Gibson offered the following opinions, which he indicated were based on his review of the records, in-person diagnostic interview with Drake, and symptom and performance validity measures:

- Records from the EMS and ED do not support the claim of a mild traumatic brain injury, also referred to as "concussion."
- If the plaintiff did sustain a concussive injury, it would have resolved within days to weeks, and certainly within months as per the DSM-5, and virtually all research on concussion. Severe impairment in cognitive functioning over a year post-event is not a known outcome of a single concussive injury.
- The plaintiff's reported symptoms are far out of proportion to the claimed injury, and not at all consistent with the pathogenesis of concussion.

7

- The plaintiff's performance on the RBANS administered by Dr. Dark proximal to the injury was completely normal, with a total score exactly where his expected level lies.  Memory testing on that assessment was normal.
- Results of subsequent testing reflect scores which are not plausible and did not clinically correlate with the plaintiff's actual level of functioning.
- No validity measures were administered on any of these evaluations, a practice which is not in line with the guidance by AACN, NAN and the AAM.  The results of those evaluations should be deemed invalid as a result.
- Dr. Johnstone's report does not constitute an "evaluation," and his opinions are informed by faulty data obtained using substandard methods.
- Dr. Johnstone purportedly assessed "validity," but never administered a single measure of validity.  Nor did he address the fact that none of the other evaluations he used to inform his opinion did.
- Given the above facts, malingering of cognitive and psychiatric dysfunction is highly likely and best explains the plaintiff's reported symptoms, their unlikely severity, and implausible nature.
- In my opinion, it is far more likely than not the plaintiff is malingering his symptoms and dysfunction.

*Id.* at 16.

Plaintiffs, relying upon *Nichols v. American Nat. Ins. Co.*, 154 F.3d 875, 883-84 (8th Cir. 1998), argue that all of Dr. Gibson's opinions are clear comments on Drake's credibility and are therefore admissible.  In *Nichols*, the Eighth Circuit reversed a jury verdict for the defendant employer in a sexual harassment case, holding that the admission of expert testimony that the plaintiff had "poor psychiatric credibility" was reversible error.  The Court held:

> Dr. Pribor's testimony about psychiatric credibility, malingering, recall bias, and secondary gain went beyond the permissible areas of her testimony.  She used these terms to indicate that Nichols' version of the facts was inconsistent and changed over time and that it was tainted by bias and desire for financial gain.  These were inferences for the jury to draw from the admissible evidence before it, and Dr. Pribor's testimony impermissibly instructed the jury on how to weigh the evidence.

154 F.3d at 883-84.

Here, Dr. Gibson's opinion that Drake is malingering is impermissible under *Nichols*.

Specifically, Dr. Gibson's statements that "malingering of cognitive and psychiatric dysfunction

is highly likely and best explains the plaintiff's reported symptoms, their unlikely severity, and implausible nature;" and "in my opinion, it is far more likely than not the plaintiff is malingering his symptoms and dysfunction" necessarily question Drake's credibility.  To this extent, the Court grants Plaintiffs' motion and will exclude any such statements.

Not all of Dr. Gibson's opinions, however, are improper comments on Drake's credibility.  Plaintiffs argue that Dr. Gibson did not "give a single admissible opinion," because he did not conduct substantive testing to evaluate Drake's cognitive or neuropsychological condition.  It is true that Dr. Gibson indicated that he could not administer the following tests due to Drake's failed performance testing:  Wechsler Adult Intelligence Scale, 4th Edition (WAIS-IV), Wide Range Achievement Test, 5th Edition (WRAT-5), Neurological Assessment Battery—Executive Functions Module, NAB Memory Module, and NAB Language Module.  (Doc. 72-4 at 3.)  Additionally, Dr. Gibson did not administer the Beck Depression Inventory or Minnesota Multiphasic Personality Inventory 3rd Edition (MMPI-3) due to Drake's complaints of fatigue and inability to read.  *Id.*

Dr. Gibson nonetheless spent *four hours* evaluating Drake.  *Id.* at 6.  During this time, he questioned Drake regarding his history, the accident, his medical treatment, and his current symptoms; conducted a mental status examination; noted observations about Drake's behavior; and performed premorbid functioning testing.  *Id.* at 3-7.  Dr. Gibson also reviewed Drake's medical, education, employment, and legal records.  *Id.* at 1-2.  Dr. Gibson's observations and opinions related to his evaluation of Drake that do not comment on Drake's credibility are admissible.  For example, Dr. Gibson found "no evidence of inappropriate affect at any point throughout the evaluation which lasted over 4 hours;" and "no evidence of any cognitive dysfunction."  *Id.* at 6-7.  Moreover, Dr. Gibson is also qualified to provide an expert opinion on

the findings of other physicians based on his review of the record and his evaluation of Gibson. These opinions do not usurp the role of the jury but, rather, provide additional medical evidence for the jury to consider.  *See, e.g. Washam v. BNSF Ry. Co.*, No. 3:19-CV-00231 KGB, 2020 WL 5880133, at *5 (E.D. Ark. Oct. 2, 2020), *on reconsideration in part,* No. 3:19-CV-00231 KGB, 2022 WL 989037 (E.D. Ark. Mar. 31, 2022) (excluding medical expert testimony that Graham displayed "symptom magnification" that was "pretty obvious," yet allowing expert to testify as to the cause of the injury and pain because expert had based his opinion on his medical training, observations, history, medical records, and orthopedic examination.)

Thus, Plaintiffs' Motion to Strike Dr. Gibson's testimony will be granted in part, in that Dr. Gibson is precluded from providing opinions regarding Mr. Drake's credibility, including the opinion that he is malingering.  The Motion to Strike is denied in all other respects.

### 2.  Dr. Turner

Dr. Turner, a vocational rehabilitation expert, has been designated by Defendants to offer opinions regarding Mr. Drake's employability and earning capacity.  Plaintiffs argue that Dr. Turner's opinion is inadmissible speculation and does not rest on any factual basis, because Dr. Turner assumes Drake has the capacity to return to work.  Plaintiffs note that Dr. Turner has never met Mr. Drake and conducted no testing of Drake.

Defendants argue that Dr. Turner is well within the bounds of his scope as a vocational rehabilitation expert to rely upon the medical opinion of experts.

The role of a vocational rehabilitation expert is to assess "the extent of an individual's disability, evaluate[ ] how the disability affects the individual's employment opportunities, and assist[ ] the individual's re-entry into the labor market."  *Masters v. City of Indep., Missouri*, 998 F.3d 827, 838 (8th Cir. 2021) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 740 (3d Cir.

10

2000)).  Because vocational rehabilitation experts "generally are not physicians, they are not competent to diagnose a person's medical condition or to opine on their physical or psychological impairments." *Masters*, 998 F.3d at 838.  "They may, however, rely on medical records, reports, and testimony about a person's medical condition, combined with other materials and their knowledge and experience about the labor market, to opine on the effect the medical condition may have on that person's vocational outlook." *Id.*

Dr. Turner is a Certified Rehabilitation Counselor, holding a Ph.D. in Rehabilitation Counseling.  (Doc. 62-3 at 4.)  He has been qualified as a vocational expert in over 1,000 Social Security Disability hearings.  *Id.*  In this case, Dr. Turner reviewed Drake's medical records and documentation in connection with this litigation, identified Drake's vocational and functional capacity, identified Drake's proficiencies and skills based on the records produced, performed a transferable skills analysis of Drake, and performed an employability analysis to include labor market research.  *Id.* at 5.  Dr. Turner stated that Drake's functional abilities in the workplace were "highly discrepant among treating and consultative providers."  *Id.* at 26.  He stated that the Social Security Administration (SSA) has provided the most specific opinion on his capacity.  As a result, Dr. Turner assumed that Drake had the cognitive capacity to perform unskilled work and the physical capacity to perform a limited range of light work, as found by the SSA.  Based on these assumptions, Dr. Turner expressed the opinion that Drake's expected earning capacity was $26,000 to $30,000 per year with benefits working full-time.

Plaintiffs take issue with Dr. Turner's assumption that Drake has the residual cognitive and physical capacity to return to work.  Citing portions of Dr. Turner's deposition testimony, they argue that Dr. Turner is assuming Drake's symptoms will improve without any evidence, assumes Drake's interpersonal skills will improve or do not affect his ability to work, and

11

assumes that Drake will be able to drive to work.  Plaintiffs contend that Dr. Turner's opinion should be stricken because he relies on his own unsupported assumptions.

A court will typically not exclude an expert's report or testimony on the basis of assumptions in their analysis.  "Raising questions about, and exposing gaps in, [an expert's] analyses and conclusions is a task for [d]efendants to perform in front of a jury." *Hanrahan v. Wyeth, Inc.*, No. 4:04CV01255 ERW, 2012 WL 2395986, at *4 (E.D. Mo. Jun. 25, 2012).  The "mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007).  Occasional speculation is "inevitable," and a certain amount of speculation is "necessary" when considering certain estimations. *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) (internal citations omitted); *see also Missouri State Conference of the National Association for the Advancement of Colored People v. Ferguson-Florissant School District*, 201 F. Supp. 3d 1006, 1017, n.3 (E.D. Mo. 2016) (stating that an expert opinion is admissible if there are "sufficient facts already in evidence ... to take his testimony out of the real of guesswork and speculation") (internal quotation and marks omitted).  As a general rule, deficiencies in the factual basis for an expert's opinions go to the weight of those opinions, rather than their admissibility. *See In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 786 (8th Cir. 2021).

The Court finds that Dr. Turner's opinions are admissible.  Dr. Turner provided opinions on Drake's employability based on the record provided to him, consistent with his role as a rehabilitation expert.  Dr. Turner acknowledged the differing medical opinions in this case regarding Drake's functional abilities and indicated that his opinion was based on the findings of the SSA.  Plaintiffs will have the opportunity to challenge these assumptions at trial.

Thus, Defendants' Motion to Strike Dr. Turner's testimony is denied.

**3. Dr. Tuwiner**

Defendants designated Dr. Tuwiner, a neurologist, to offer opinions regarding Drake's injuries and functional abilities. On November 1, 2023, Dr. Tuwiner expressed the opinion that Drake sustained a scalp contusion, soft tissue injuries, self-limited cervical strain injury, a pelvic fracture, and an adjustment reaction with anxiety related to the May 2017 motor vehicle accident. (Doc. 64-4 at 50.)

Plaintiffs first argue that Dr. Tuwiner's opinions criticizing Drake's treating and retained neuropsychologists should be stricken because Dr. Tuwiner lacks the qualifications necessary to provide expert neuropsychological opinions. They also argue that Dr. Tuwiner's opinions are inadmissible because they amount to an inappropriate determination of Drake's credibility as a witness.

**a. Qualifications**

Plaintiffs take issue with Dr. Tuwiner's deposition testimony in which he criticizes the neuropsychologic evaluation of Dr. Dark on February 20, 2018, as containing a "paucity of measures." (Doc. 64-3 at 10.) Dr. Tuwiner testified that he would have liked to see additional validity tests performed by Dr. Dark. *Id.* at 10-11. He further testified that he "profoundly" disagreed with the findings of neuropsychologist Dr. Jordan, particularly the finding that Drake's pain and depression were not the primary drivers of his cognitive difficulties. *Id* at 27. Dr. Tuwiner stated that he disagreed with Dr. Jordan's opinion that Drake was not likely to be able to return to work "from a neurological standpoint." *Id.*

Defendants, citing *Robinson*, 447 F.3d at 1100-1101, argue that Rule 702 does not require a defense medical expert to be of the identical medical specialty as the plaintiff's expert.

13

In *Robinson*, a neurologist provided expert testimony regarding the cause of the plaintiff's shoulder problems. The Eighth Circuit held that, "[a]lthough not an orthopedist, Dr. Horenstein assisted the trier of fact with relevant testimony from his expertise in neurology." *Id.* at 1101. The Court explained that the doctor's testimony "regarding the usual onset of shoulder pain was within his realm of expertise as a neurologist." *Id.* Defendants argue that, because Dr. Tuwiner testified that he typically engages with neuropsychologists in evaluating patients, his testimony is admissible.

The Court finds that Dr. Tuwiner is qualified to provide the expressed opinions. Dr. Tuwiner testified that, in his practice as a neurologist, he often works with neuropsychologists on the mutual treatment of a patient. He explained that when he refers a patient to a neuropsychologist, he talks with the neuropsychologist about the patient's problems, provides his preliminary opinion, and asks the neuropsychologist to perform certain tests. (Doc. 71-1 at 33.) Dr. Tuwiner explained that he had this type of conversation with Dr. Gibson before Dr. Gibson examined Drake. *Id.* As a result, Dr. Tuwiner is qualified based on his experience to express the opinion that Drake's treating or expert neuropsychologist did not perform adequate testing. He is similarly qualified to express his disagreement "from a neurological standpoint" that Drake is not capable of returning to work.

### b.  Credibility Opinions

Plaintiffs next argue that many of Dr. Tuwiner's opinions are inadmissible under *Nichols*, 154 F.3d at 875, because they amount to an inappropriate determination of Drake's credibility as a witness. Plaintiffs cite the following opinions of Dr. Tuwiner set forth in his report and/or deposition: Drake is malingering; Drake misattributes his symptoms; Drake's symptoms are

14

purely psychosomatic; and Drake's symptoms are the result of his involvement in litigation. (Doc.  64-4 at 36, 40-43, 45-46; Doc. 64-3 at 18.)

Defendants respond that, unlike the expert in *Nichols*, Dr. Tuwiner's opinions are based on his medical training, medical records, and his own examination.

Dr. Tuwiner's main conclusion set forth in his report was that there was no medical evidence to support a mild traumatic brain injury/concussion, mild neurocognitive disorder, post-traumatic headaches, whiplash-induced headaches, post-traumatic dizziness disorder, post-traumatic visual disorder, lumbosacral strain injury, or PTSD in relation to the accident.  (Doc. 64-4 at 50.)  He explained that, to find Drake sustained a mild TBI/concussion in relation to the accident and sustained neurocognitive sequalae "would require that one give Mr. Drake a far reaching benefit of the doubt by believing his self-report of symptoms as a matter of fact," and would require one to "not fully consider standard criteria for mild TIBI/concussion, the dynamics and expected symptoms presentation of a mild TBI/concussion and ignore if not minimize the temporal relationship of the onset of  Mr. Drake's myriad of endorsed symptoms and the 5/4/17 MVA."  *Id.* at 51.  These conclusions are based on Dr. Tuwiner's review of Drake's extensive medical records as well as Dr. Tuwiner's own physical and neurological examination of Drake, as set out in Dr. Tuwiner's 52-page report.  (Doc. 64-4.)  The Court finds that these opinions regarding Drake's medical condition are within Dr. Tuwiner's expertise as a neurologist and are admissible.

As Plaintiffs point out, however, Dr. Tuwiner also makes direct comments on Drake's credibility.  For example, Dr. Tuwiner testifies that Drake is malingering, "misattributes" his symptoms, his symptoms are purely psychosomatic, and his symptoms are the result of his

involvement in litigation.  These statements, like those of Dr. Gibson's discussed above, are inadmissible under *Nichols* and will be stricken.

Thus, Plaintiffs' Motion to Strike the testimony of Dr. Tuwiner will be granted in part and denied in part.

### C.  Defendants' Motions

### 1.  Linda Day

Plaintiffs retained Linda Day to provide opinions in the following areas: (1) "general trucking industry customs, practices, and standards;" (2) the "operating performance of Defendant Barnes," (3) the "motor carrier management practices of Old Dominion," and (4) "determinations of accident preventability from an industry standpoint."  (Doc. 77-2 at 4.)

Defendants first argue that Ms. Day is not qualified to render opinions or testimony regarding the cause of the accident or regarding Barnes' failure to follow industry standards. They next argue that Ms. Day's opinions should be excluded because they are not based on the facts of this case.  Defendants also contend that Ms. Day's testimony is flawed because she misunderstood the degree of care required in Missouri.  Finally, Defendants argue that any opinion testimony by Ms. Day regarding Old Dominion's training should be stricken as irrelevant because Plaintiffs brought no claims for negligent training or supervision.

The undersigned will discuss these claims in turn.

### a.  Qualifications

Defendants argue that Ms. Day is not an accident reconstructionist and is not qualified by experience or training to offer any opinions regarding the cause of the accident at issue in this case.

16

Plaintiffs respond that Ms. Day possesses the requisite knowledge, skill, experience, training and/or education to opine as to trucking industry standards and compliance issues. They acknowledge that Ms. Day is not an accident reconstructionist and note Ms. Day testified that she would not be offering any opinions as to accident reconstruction in this case. Plaintiffs state that Ms. Day's four decades of experience in many facets of the trucking industry make her a "uniquely qualified individual to testify to industry standards and practices." (Doc. 91 at 8.)

Ms. Day has worked in the transportation industry since 1984. (Doc. 91-4 at 1.) She received her CDL with endorsements for hazardous materials, tankers, double and triple trailers, school buses, and passenger buses in 1995, and testified that she had driven close to 1,000,000 miles in her career. *Id.* In addition to her work as an over-the-road driver, she has worked as a transportation manager, driver manager, driver trainer, safety officer, certified log instructor, and fleet manger trainer. *Id.* She has a Distracted Driving certificate of training in the Smith System. *Id.* Ms. Day has a bachelor's degree in operations management and analysis, a master's degree in organizational management with a specialization in leadership, and a master's degree in finance. *Id.* She has provided expert opinions in prior legal proceedings. *Id.* As Defendants point out, Ms. Day testified that she did not feel comfortable driving a double trailer like that driven by Mr. Barnes, had done so for only four miles in her career, and had received no training specific to pulling double trailers. (Doc. 77-1 at 9-10.)

The Court agrees with Plaintiffs that Ms. Day is qualified to provide opinions related to general trucking industry safety standards. The Court next turns to Ms. Day's opinions in this case.

**b.  Ms. Day's Opinions**

Ms. Day first expressed the opinion that Barnes knew or should have known the

information set out in federal regulations, the CDL Manual, and the Smith System, but deviated from the Smith System.  (Doc. 77-2 at 20-22.)  Ms. Day indicates in her report that the Smith System involves the following safety concepts: "Aim High In Steering," "Get the Big Picture," "Keep Your Eyes Moving," "Leave Yourself An Out," and "Make Sure They See You."  *Id.* at 22.  Ms. Day also opined as follows: Barnes failed to keep a careful lookout when he made the left turn across the highway, Barnes failed to adhere to industry safe driving standards and practices as it relates to speed and space management, and Barnes failed to respond to hazards around him.  *Id.* at 22-25.  Additionally, Ms. Day provided opinions regarding Old Dominion's failure to train and supervise Barnes.  *Id.* at 13-19.

Defendants argue that Ms. Day's opinions should be excluded because they are not tied to  the facts of this case.  Instead, Defendants contend that her opinions are based solely on the fact that an accident occurred.  They also argue that Ms. Barnes' opinions regarding Old Dominion should be excluded as irrelevant, because Plaintiffs do not assert a failure to train claim against Old Dominion.

The undersigned agrees that Ms. Day's opinions regarding Old Dominion's alleged failure to train or supervise Barnes should be excluded as irrelevant.  The sole basis for Old Dominion's liability is *respondeat superior* liability for Barnes' alleged negligence.

Concerning Barnes' negligence, Ms. Day testified at her deposition that she agreed that Barnes did *not* violate the Federal Motor Vehicle Carrier Safety Regulations ("FMCSRs"), as the FMCSRs "do not encompass a left turn."  (Doc. 77-1 at 26.)  She also acknowledged that the CDL manual does not specifically address making left turns when pulling two and three trailers. *Id.* at 30.

Ms. Day further testified as follows during her deposition:

Q. **And you don't have anything specifically to say that Mr. Barnes violated the Smith System, do you, ma'am**? I think we talked about that.

A. *Other than the accident*?

Q. Right. But you've admitted that you're not aware of what he was able to see when he started his turn, true?

A. *Correct*.

Q. So all of those, failed to look far enough ahead, failed to get the big picture, keep your eyes moving, **you don't have any evidence to support a violation of any of those other than a collision occurred between Mr. Barnes' tractor-trailer and Mr. Drake's vehicle**?

   [Plaintiffs' Counsel]: Objection, misstates her testimony, but you can answer.

A. *Yes, sir*.

Q. So you're agreeing with me that you don't have any evidence?

A. Physical, no.

Q. Well, **other than a collision occurred, you have nothing to support—or no factual basis for a violation of the Smith System in this case, true**?

A. *Correct*.

(Doc. 77-1 at 36.) (emphasis added). When questioned regarding her opinion that Barnes failed to adhere to standards relating to space management and hazards, the following testimony was elicited:

Q. So how much field of view did Mr. Barnes' passenger side mirror give him? Meaning how far, I guess, to the west would his passenger side mirror allow him to see? And I mean far to the west from the edge of the trailer.

   [Plaintiffs' Counsel]: Objection, speculation. You can answer if you know.

A. I wouldn't know how his mirrors were positioned.

Q. Okay.

A. So I couldn't say definitely.

Q.  Right.  But you're critical here saying he should have seen Mr. Drake, I guess, moments before impact, right?

A.  Correct.

Q.  And by that time, it's probably too late, isn't it?

A.  It could have been, yes.

Q.  So your opinion on Page 24 probably doesn't matter, does it?

A.  The side view, no, that is difficult to see when you're in that position.

Q.  Okay.  All right.  We talked about that.  The opinion on Page 26, you say Barnes was not a prepared defensive driver.  What's the basis for that?

A.  He crossed an intersection without proper space.

Q.  Okay.  So that's based on-

A.  The collision.

Q.  Right.

*Id.* at 37.

Although Ms. Day is qualified to provide opinions regarding general trucking industry safety standards, Ms. Day does not cite any regulations that Barnes violated.  Instead, she opines that, because the accident occurred, Barnes must have necessarily violated the Smith System.

 The Northern District of Georgia[2] recently considered very similar challenges to the admissibility of Ms. Day's opinions in *Perry v. Cummings*, No. 1:22-cv-03860, 2024WL3552954, *1 (N.D. Ga. May 6, 2024).  There, the plaintiffs in a personal injury action retained Ms. Day to testify that the defendant truck driver did not follow trucking industry standards.  *Id.*  The Court described Ms. Day's opinions as "generalities as to what truck drivers should do and be trained to do to avoid accidents."  As such, the Court found the opinions were

---

[2] United States District Judge Thomas W. Thrash, Jr.

inadmissible "because they will not help the trier of fact to understand the evidence or determine a fact in issue." *Id.* Additionally, the Court found that Ms. Day's opinions were not the product of reliable principles and methods. *Id.* at 2. The Court explained as follows:

> Her opinions are abstract propositions applicable to any accident but are not applied to the particular facts of this case other than the fact that the accident happened, which is not in dispute. Her opinions are not based on sufficient facts or data, as the only facts upon which her opinions are based is what is contained in the police report for the subject accident. She has no opinions on the particular facts involved in the subject accident or why Defendant Cummings failed to stop. Thus, Day's opinions are not admissible under Rule 702 because they are not the product of reliable principles or methods.

*Id.*

The undersigned finds the reasoning set out in *Perry* persuasive. Ms. Day's deposition testimony reveals that her opinions that Drake failed to adhere to industry standards are based solely on the fact that an accident occurred. Thus, her opinions are not the product of reliable principles or methods and would not assist the jury.

Accordingly, Defendants' Motion to Exclude Ms. Day's testimony will be granted.

### 2. Dr. Johnstone

Brick Johnstone, Ph.D., ABPP, was retained by Plaintiffs "to determine the validity, causation, and extent of Mr. Drake's neuropsychological impairments." (Doc. 79-1 at 1.) Defendants argue that the Court should exclude the testimony of Dr. Johnstone that Drake suffered a thalamic injury because this opinion was untimely disclosed.

Rule 26(e)(1) provides that "[a] party who has made a disclosure under Rule 26(a) ... must supplement or correct its disclosure ... in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]" For an expert witness, "the party's duty to supplement

extends both to information included in the report and to information given during the expert's deposition," and "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2).

 "The duty to supplement [an expert report] arises when the expert subsequently learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate."  *McClurg v. Mallinckrodt, Inc.*, No. 4:12-CV-00361-AGF, 2017 WL 3116138, at *3 (E.D. Mo. July 21, 2017) (quotation omitted).  However, Rule 26(e) does not provide a vehicle for parties to merely "revise or change its disclosures," "to bolster an expert's opinion," or "to present entirely new theories."  *In re Ahern Rentals, Inc., Trade Secret Litig.*, No. 20-02945-MD-C-BP, 2023 WL 9895102, at *4 (W.D. Mo. Nov. 15, 2023).

Plaintiffs timely designated Dr. Johnstone and provided his report to Defendants on July 25, 2023.  The parties in this case filed numerous motions to extend discovery deadlines, which the Court granted.  Most recently, on October 15, 2024, the Court extended the deadline for Plaintiffs' disclosure of rebuttal witnesses to February 29, 2024 and extended the deadline for completion of all discovery to April 30, 2024.  (Doc. 59.)  This action is set for trial on January 9, 2025.

In his report dated April 27, 2023, Dr. Johnstone expressed the opinion that Drake "has suffered persisting and significant neuropsychological weaknesses due to his MVA and associated TBI suffered on May 4, 2017."  *Id.* at 3.  Dr. Johnstone further states:

> Of note, Mr. Drake has reported and demonstrated primarily left hemisphere neuropsychological impairments, headaches, and chronic pain since his accident. ***He is noted to demonstrate and report impairments suggestive of subcortical dysfunction*** including weakness in memory, spelling, and sensory disturbances (e.g., chronic pain, distorted auditory/vision sensitivity, smell, etc.).

*Id.* at 4 (emphasis added).

During his November 13, 2023, deposition, Dr. Johnstone testified that "given all of the symptoms that Mr. Drake has demonstrated in this…it suggests that he had a very mild TBI, he had some insult to the brain that six weeks later was associated more likely than not with some type of thalamic dysfunction that is the primary cause of his difficulties." (Doc. 79-2 at 22.)  He explained that Drake "had possibly, like, a small TIA, or a small stroke," which he did not realize until he "saw Dr. Tuwiner's report." *Id.*  Dr. Johnstone stated that, "the articles that I looked at to help me form my decisions here," demonstrate that Drake's symptoms are "common symptoms of thalamic infarct that most people are not aware of." *Id.*  When asked by Defendants' counsel "Where is that in your report?", Dr. Johnstone responded, "That's not in my report." *Id.*  Upon further questioning as to the "timeline" and bases of his opinion, Dr. Johnstone testified as follows:

> And ***after reading [Dr.] Tuwiner's report*** and seeing that everything seemed to kind of happen at six weeks post, like right when he was ready to go back to work, and these are not symptoms that people usually make up, and I do not think that Mr. Drake is sophisticated enough to kind of make these things up, you know, like loss of vision in one eye, and only left-sided headaches, and visual hallucinations, and some of the things that he describes.
> And ***then when I read Dr. Tuwiner's report*** and he basically says, you know what, he hit his head.  He listed that like 10 different places.  He says the problem is that doesn't fit the normal recovery of mild TBI.
> And I totally agree.  And what it fits is thalamic infarct.  And the issue seems to be the relationship between the car accident and this event.  And if you go back and look at his history, and I looked at Dr. Tuwiner's report very carefully, and there doesn't seem to be anything to suggest that, you know, even if he didn't have the car accident, he probably would have had this thalamic stroke. It seems to be he had this mild brain injury, he had some cognitive difficulties in the ER, they had some concerns, so they got a CAT scan there, he went home, and he had primarily the pelvic pain, which he focused on.
> So those are all the facts that kind of formed my opinions as they stand today.

*Id.* at 24.

### a. New Opinion

Defendants argue that Dr. Johnstone's opinion as to Drake's purported thalamic injury was a new opinion rather than a mere clarification or correction of an earlier mistake. As such, they contend that the opinion is not proper for supplementation. Further, they note that Plaintiffs never attempted to supplement Dr. Johnstone's initial report. For these reasons, Defendants argue that Dr. Johnstone's opinion regarding the existence of a thalamic injury should be excluded.

Plaintiffs respond that Dr. Johnstone's opinion regarding Drake's thalamic injury was *not* newly disclosed during his deposition but was in fact the same opinion he authored in his report. Specifically, they point to the statement in Dr. Johnstone's report that Drake demonstrated and reported symptoms suggestive of "subcortical dysfunction." (Doc. 79-1 at 4.) They argue that Defendants "fail to recognize that the subcortical dysfunction that Dr. Johnstone references in his report is a thalamic injury." (Doc. 90 at 2.) Plaintiffs contend that Dr. Johnstone's deposition testimony reveals that when he used the words "subcortical dysfunction" in his report, he was referring to the thalamus. As a result, Plaintiffs argue that a supplemental report was not required. They further argue that Dr. Johnstone's opinion was not based on the report authored by Dr. Tuwiner but was based on his own review of Drake's records.

The Court finds Plaintiffs' characterizations of Dr. Johnstone's deposition testimony not entirely accurate. Plaintiffs' counsel asked Dr. Johnstone the following question during his deposition: "What is the area of the brain that you are referring to when you report in Page 4 of your April 27, ...2023 report that he had subcortical dysfunction?" (Doc. 79-2 at 34.) Dr. Johnstone responded as follows, in relevant part:

> My primary concern was to provide focus on the parts of the brain that are below the cortex that could possibly be involved. When I say subcortical, that would be

like the thalamus, the mammillary bodies, the amygdala, the basal ganglia.  That's subcortical.

*Id.*  Defendants' counsel subsequently inquired of Dr. Johnstone: "When you say subcortical in your report, you are not referring to the thalamus, you are just referring to that area of the brain, true?"  *Id.* at 36.  Dr. Johnstone responded: "True."  *Id.*

When Dr. Johnstone's report and deposition testimony are read as a whole, it is evident that Dr. Johnstone did not provide the opinion that Drake suffered an *injury to his thalamus* until his deposition.  His report expressed the more general opinion that Drake's symptoms were "suggestive" of "subcortical dysfunction."  As Dr. Johnstone explained in his deposition, the term "subcortical" refers to an area of the brain encompassing not just the thalamus but also the mammillary bodies, the amygdala, and the basal ganglia.  Dr. Johnstone's deposition testimony also makes clear that he did not arrive at this more specific opinion concerning an injury to the thalamus until after he reviewed Dr. Tuwiner's report.  Dr. Tuwiner's report was not authored until November 1, 2023—approximately six months after Dr. Johnstone's report was authored and only thirteen days before Dr. Johnstone's deposition.

Having found Dr. Johnstone's opinions provided during his deposition differ from those in his report, the Court next considers whether the opinions should be excluded due to his failure to disclose them.

Dr. Johnstone's opinions provided during his deposition "merely expand upon or clarify initial opinions" and do not express new or contradictory opinions that might prejudice the defendants. *Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 971 F. Supp. 2d 896, 903 (E.D. Mo. 2013).  Although Dr. Johnstone should have supplemented his initial report, Defendants were not prejudiced due to his failure to supplement.  Dr. Tuwiner's report, upon which Dr. Johnstone relied in part in forming his opinion regarding thalamic injury, was not

25

authored until thirteen days prior to Dr. Johnstone's deposition. Defendants were able to adequately cross-examine Dr. Johnstone regarding his opinion. They also had ample opportunity ahead of the January 2025 trial setting to obtain—and did obtain—their own expert testimony to refute Dr. Johnstone's testimony.

The Court therefore finds that permitting Dr. Johnstone's testimony regarding thalamic injury will best serve the purposes of Rule 26. *See, e.g., Robson v. Duckpond Ltd.*, No. 4:19-CV-01862-SRC, 2021 WL 719887, at *4 (E.D. Mo. Feb. 24, 2021 (permitting supplemental report even though it was not based on new information when the supplemental did not alter underlying methodology); *McClurg*, 2017 WL 3116138, at *3 (permitting supplemental report based on publicly-available information discovered during opposing expert's testimony because the supplemental report did not change the expert's underlying methodology and the Court had not set a trial date or deadline for pretrial disclosures yet); *Coene v. 3M Co.*, 303 F.R.D. 32, 45 (W. D. N.Y. 2014) (refusing to impose the "harsh" remedy of excluding supplemental expert opinion disclosed well in advance of trial, notwithstanding a finding that the supplement was not truly a correction based on new information but was in fact a new opinion as to causation, issued after the depositions of both sides' experts).

### b. Rebuttal Opinion

Defendants next argue that Dr. Johnstone attempts to include his opinion regarding Drake's thalamic injury in his rebuttal expert report to rebut the opinion of Dr. Gibson. They contend that Dr. Johnstone's opinion regarding the reported thalamic injury is not appropriate rebuttal evidence because Dr. Gibson only provided testimony on the issue of whether Drake suffered a thalamic injury due to Dr. Johnstone's improper deposition testimony.

On February 29, 2024, Plaintiffs disclosed Dr. Johnstone as a rebuttal witness to rebut the report and deposition testimony of Dr. Gibson.  (Doc. 79-4.)  Plaintiffs state as follows:

> Dr. Johnstone is expected to give opinions to rebut the opinions of Defendants' Expert, Douglas P. Gibson, Psy. D., M.P.H., ABPP, HSP, including but not limited to, Dr. Gibson's opinion that Mr. Drake's symptoms, complaints, and neuropsychological test results are inconsistent with brain injury as a result of the May 4, 2017 wreck caused by Defendants, that Mr. Drake is malingering, and that Dr. Dark and Jordan failed to administer any measures of validity/effort and as such their evaluations and conclusions are invalid.  It is expected that Dr. Johnstone will testify as to the inconsistencies and/or inaccuracies of Dr. Gibson's report and deposition testimony.  It is further expected that Dr. Johnstone will testify as to Dr. Gibson's lack of qualifications, expertise, or knowledge regarding the field of neuropsychology, especially as it relates to determining malingering.

(Doc. 79-4 at 2.)

Rule 26(a)(2)(D)(ii) contemplates rebuttal expert reports "if the evidence is intended solely to contradict or rebut  evidence on the same subject matter identified by" another party's expert witness or witnesses.  "Under Eighth Circuit law, 'rebuttal evidence may be used to challenge the evidence or theory of an opponent – and not to establish a case-in-chief.'"  *In re Air Crash Near Kirksville, Mo. on Oct. 19, 2004*, No. 4:05MD1702 JCH, 2007 WL 2363505, at *1 (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006)).  Put another way, rebuttal expert evidence is "used to 'explain, repel, counteract or disprove evidence of the adverse party.'"  *Id.* at *3 (quoting *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir. 2005)).  However, "'[t]he fact that testimony would have been more proper for the case-in-chief does not preclude the [rebuttal] testimony if it is proper both in the case-in-chief and in the rebuttal.'"  *Mason v. Safeco Ins. Co. of Am.*, No. 4:09-CV-1081 CAS, 2010 WL 5070723, at *7 (E.D. Mo. Dec. 6, 2010) (quoting *United States v. Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980)).

The undersigned has reviewed Dr. Johnstone's rebuttal report and finds it does not go beyond the scope of Dr. Gibson's report and is not improper rebuttal evidence. Dr. Johnstone calls into question Dr. Gibson's qualifications in offering testimony on neuropsychology and his failure to rule out a thalamic injury as a cause of Drake's impairments. (Doc. 79-3.) Defendants' argument is based primarily on the premise that Dr. Johnstone's deposition testimony regarding a thalamic injury was a new opinion that should be excluded. The undersigned has found that Dr. Johnstone's testimony is admissible as a clarification based on his review of Dr. Tunwiner's report, which was not available to him until less than two weeks before Johnstone's deposition. Thus, Defendants' argument lacks merit.

### c. Methodology

Defendants' final argument is that Dr. Johnstone's opinion regarding Drake's purported thalamic injury should be excluded because it is not supported by sufficient methodology. Defendants cite the following alleged flaws in Dr. Johnstone's methodology: he relies on his history of research and observations over the years; he disagrees with Plaintiffs' own rebuttal expert, Dr. Hopewell, that there was no thalamic injury; he concedes that no treater of Drake's has diagnosed a thalamic injury; he came to this opinion by reviewing the report of Defendants' expert Dr. Tuwiner; and he identified testing that could identify injury to Drake's thalamus but never performed any kind of testing on Drake.

The Court finds that none of Defendants' arguments warrant the exclusion of Dr. Johnstone's opinions. Instead, they are relevant to the weight a jury will decide to allot to Dr. Johnstone's testimony, not its admissibility. "As the Supreme Court emphasized in *Daubert*, 509 U.S. at 595-96, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky

but admissible evidence." *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003). Defendants will have ample opportunity at trial to challenge Dr. Johnstone's opinions and the factual bases upon which they rest through cross-examination and the presentation of contrary evidence.

Thus, Defendants' Motion to Exclude Dr. Johnstone's Testimony will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Strike Defendants' Expert Douglas P. Gibson, Ph.D. (Doc. 60) is **granted in part** and **denied in part**. The Motion is **granted** in that Dr. Gibson is precluded from providing opinions regarding Mr. Drake's credibility. The Motion is **denied** in all other respects.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Richard Turner, Ph.D. (Doc. 62) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Seth Tuwiner, M.D. (Doc. 64) is **granted in part** and **denied in part**. The Motion is **granted** in that Dr. Tuwiner is precluded from providing opinions regarding Mr. Drake's credibility. The Motion is **denied** in all other respects.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Plaintiffs' Expert Linda Day (Doc. 76) is **granted.**

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Dr. Johnstone's Expert Opinion Testimony (Doc. 78) is **denied**.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of November, 2024.

29